UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CAROL ROBLING,

       Plaintiff,

v.                                                                Case No: 8:14-cv-396-T-27TBM

ITT EDUCATIONAL SERVICES, INC.,

       Defendant.

_____/

## ORDER

**BEFORE THE COURT** is Defendant's Motion for Summary Judgment and Incorporated

Memorandum of Law (Dkt. 14), and Plaintiff's response (Dkt. 17). Upon consideration, Defendant's

motion for summary judgment is **GRANTED**. The undisputed material evidence demonstrates that

Plaintiff was terminated for a legitimate, non-pretextual reason.

**I.     BACKGROUND**

    **A.     Robling's Employment**

Carol Robling was employed as an Administrative Assistant by Defendant ITT Educational

Services, Inc. ("ITT") from March 1991 until December 11, 2012 when ITT terminated her (Robling

Dep. 24:5-6; 29:1-3).   In 2007, Robling became an Administrative Assistant for Tampa Campus

Director Dennis Alspauth (*Id.* 30:15-23). She was considered a good employee and trained other

Administrative Assistants (Lynn Dep. 35:6-24).   Among others, the essential functions of an

Administrative Assistant included supporting the Campus Director and processing timecards and

payroll reports.  (Robling Dep. 50:5-16; Dkt. 14-5 at 14-15).  Both Robling and coworker Tracey

Jackson-Rice served as Administrative Assistants to Alspauth until he retired in January 2012.

1

(Robling Dep. 30:24-25; 31:1-5).  District Manager Sam Lynn believed that under Alspauth's leadership, the Tampa campus was poorly managed; received unsatisfactory or marginal audit results; Alspauth did not hold people accountable; and a lot of things at the Tampa Campus could have been fixed if he would have held some people accountable.  (Lynn Dep. 22:9-23:3; 32:2-14; 123:6-18).

On April 23, 2012, Sheryl Gunning became the new Tampa Campus Director. (Gunning Decl. ¶1).  Prior to April 23, 2012, Gunning was the Director at ITT's Pinellas County campus for 4½ years. (Gunning Dep. 9:23-25). Lynn recommended Gunning for the Tampa Director position based upon her attention to compliance. (Lynn Dep. 26:6-10; 123:13-18). Both Robling (age 59) and Rice (age 43) became her Administrative Assistants. (Robling Dep. 35:16-17; Gunning Dep. 35:6-7). At that time, Gunning discussed with Robling and Rice the need to reduce down to only one Administrative Assistant (Robling Dep. 101:25-102:7).  Gunning asked Robling her preference: remain her Administrative Assistant or move into the Marketing Administrative Assistant position or the Education/Nursing Administrative Assistant position (*Id.*; Dkt. 14-5 at 21). Robling decided to remain Gunning's Administrative Assistant and Gunning permitted her to stay in that position. (Robling Dep.105:7-11; Dkt. 14-5 at 21). Rice took the Education/Nursing Administrative Assistant job. (*Id.* 105:2-4).  In connection with these discussions, on or about June 15, 2012, Robling claims she overheard Gunning say to Rice that she would prefer Rice to be the Marketing Administrative Assistant because "Tracey is young, looks sexy, and smiles."  (Dkt. 14-5 at 21).

**B.    ITT's Policies**

ITT has a Corrective Action policy which provides in pertinent part:

> Counseling employees is a preliminary step that, depending upon the severity of the employee's performance deficiency or inappropriate conduct, may be taken prior to formal corrective action and should be conducted when the supervisor considers counseling necessary to bring an employee's performance or conduct to the expected level. ... All counseling must be documented on the standard counseling form. ...

2

[C]ompleted Counseling Forms related to the performance and/or conduct at issue must be submitted to the Human Resources Department when the supervisor seeks to initiate corrective action.

. . .

Written warnings may occur after an employee fails to satisfy work performance and/or conduct expectations, or if prior counseling related to work performance and/or conduct problem(s) has not been successful. The Human Resources Department will determine whether a written warning is the appropriate corrective action under the circumstances.

. . .

Corrective action determinations will depend on the nature and severity of: the employee's conduct, performance and/or record; the frequency with which the performance and/or conduct at issue has occurred; and any other extenuating circumstances.

. . .

ITT/ESI in its sole discretion, will determine the corrective action. ITT/ESI may repeat, modify or omit levels of corrective action based on its assessment of the facts of the specific situation.

. . .

A final written warning… may occur when:… ITT/ESI determines that the nature of the work performance or conduct requires more than a written warning.

. . .

Termination of an employee's employment can occur at any time in the sole discretion of ITT/ESI, including, without limitation, if ITT/ESI determines that the requirements of a final written warning are not met or a counseling, a written warning or a final warning is not sufficient. All terminations of employment must be approved in advance [by] the Director of Human Resources.

(Dkt. 14-5 at 11-13). Robling was familiar with all of these policies which were readily accessible on ITT's intranet. (Dkt. 14-4, Robling Dep. Dkt. 14-4, 40:15-20; 45:13-46:9; 46:13-22; 47:13-24; 49:24-50:1, Sept. 11, 2014). Robling also testified she understood that ITT could forego counseling and go right to termination, depending on the seriousness of the offense. (Robling Dep. 71:19-25).

ITT also had a vacation policy requiring that all vacation time be requested in advance and in writing, and to the extent possible, be made at least two weeks in advance. (Dkt. 14-7, Gunning Decl. ¶3, Ex. A). Every manager and supervisor is responsible for approving a request for vacation

time and authorizing the Payroll Department's payment of vacation time. *Id.* ITT's sick time policy requires every supervisor to approve in advance (to the extent possible), document, and authorize all sick time taken by an employee. (*Id.* ¶4, Ex. B; Dkt. 17-5, Gunning Dep. 46:8-47:12).

### C.   Robling's Discipline History, Complaints, and Termination

At ITT, the established payroll process is as follows: every other Friday, employees or supervisors would turn in their timecards or their department's timecards to Robling; she would check them for the supervisor's authorizing signature; put them in order; give them to Gunning for her final approval and signature; and Robling would then submit the approved timecards to the Payroll Department by the following Monday afternoon. (Robling Dep. 55:2-25; 56:1-2).

On June 28, 2012, Gunning sent an e-mail to Robling inquiring why three employees' vacation and sick time were posted to the payroll register differently than what Gunning had approved. (Dkt. 14-5 at 17). Gunning wrote: "If a timecard needs revisions after they have been approved, I need to review them again." (*Id.*) Robling replied that one employee (Egan Hanson) "did not have any sick time left, so he had to take a vacation day. The others I submitted incorrectly." *Id.*; (Robling Dep. 74:13-25; 75:3). During her deposition, Robling admitted to making these payroll errors, which required three Pay Correction Forms to fix. (*Id.* 79:13-15; 80:21-25). Gunning also wrote: "the supervisor has to approve using vacation instead of sick time. We should not automatically be switching it. … No sick time = time without pay." (Dkt. 14-5 at 16). In the June 28 e-mail, Gunning told Robling "I am trying to reset some of the thinking when it comes to sick time and vacation time. … Please help me try to change the current environment." (*Id.*) That day, Gunning filled out a Counseling Form to document the issue, and pursuant to the Corrective Action Policy, it was placed in Robling's personnel file. (Gunning Decl. ¶7; Dkt. 14-5 at 18-19). Gunning wrote

4

that Robling

> keyed in vacation time instead of sick time for Egan Hanson . . . without getting
> approval from Egan's supervisor or the Director. When questioned why . . . Robling
> replied that the employee was out of sick time so she just made the adjustment. She
> mentioned that this behavior has always been done in the past.

(*Id.*)

The following day, June 29, 2012, Robling called Gunning's supervisor, Lynn, stating there were problems in Tampa, including a hostile work environment, age and sexual discrimination. (Robling Dep. 85:7-14).[1] Lynn asked Robling to e-mail her grievances to him. (*Id.* 85:15-22). That evening, Robling sent a timeline (*see* Dkt. 14-5 at 20-21). (*Id.* 86:5-12). Robling's timeline identified a number of incidents with Gunning she deemed inappropriate, include that on June 21, 2012, when Gunning gave Robling a choice of positions, Gunning stated she preferred Rice as the Marketing Administrative Assistant because "**Tracey is young, looks sexy, and smiles**."[2] (Dkt. 14-5 at 20-21) (emphasis in original) .

Also on June 29, 2012, Rice sent her own written complaint to Lynn, stating, among other things, that on June 15, 2012, Gunning told Rice she should be marketing secretary "because [Rice is] cute and <u>sexy</u> and 80% of our students are male" (emphasis in original). (Dkt. 14-5 at 27). Rice testified, however, that Gunning's comment was that she wanted Rice as the Marketing Administrative Assistant because Rice is "cute and sexy and 80% of our students are male." (Rice Dep. 33:17-23, 34:13-18; Dkt. 14-5 at 27). Rice testified later that "as much as Cheryl rambled, she could have said both" "young and sexy" and "cute and sexy" and that Robling could have heard it.

---

[1] In her deposition, Robling defined a hostile work environment as "micromanaging," "having conversations with loud voices, not in an office, in the middle of the hallway," and "[u]nprofessional." (Robling Dep. 195:14-19).

[2] In her deposition, Robling testified that the "young and sexy comment" was not directed to her and that Gunning was referring to Rice. (Robling Dep. 103:4-8).

(Rice Dep.162:4-22). Within a week, Lynn met with Robling and Rice in person. (Lynn Dep. 51:5-8, 52:8). Lynn also discussed the complaint with ITT's Human Resources Department ("HR") and spoke with Gunning about her style of communication. (*Id.* 57:7-9; 58:2-8, 61:24-62).

On July 3, 2012, Gunning forwarded an e-mail from ITT's Sr. Vice President of Operations Barry Simich to the Tampa Managers and Administrative Assistants, including Robling. (Gunning Decl. ¶6; Dkt. 14-7 at 13-16). The e-mail directed: (1) what the standard campus hours should be (starting at 7:30 am Monday through Thursday); and (2) that the decision to schedule employees' work hours outside the approved campus hours should be made after consultation with a District Manager. (Dkt. 14-7 at 15).

On July 10, 2012, Robling sent an e-mail to Gunning stating: "According to Annette [Barnes, in payroll] there is no policy that an employee cannot take a vacation day if they are out of sick time." (DKt. 14-5 at 29-30). Gunning replied "I would still like a supervisor to be involved in the approval process of any employee who is unable to work their posted schedule." *(Id.)*.

On July 16, 2012, Gunning sent an inquiry to Annette Barnes in payroll about two employee's over-use of vacation time as sick time, and she copied Robling. (Dkt. 14-5 at 31-32). Annette wrote back that an employee can go up to 40 hours in arrears for vacation, adding that "The employee's supervisor or campus director can approve the vacation time." (*Id.*).

On July 20, 2012, Gunning asked Robling to assist her in ITT's "VIP Initiative" by contacting VIPs, such as elected officials, to arrange a visit. (Dkt. 14-5 at 33-34). Robling responded "I had thought you had e-mailed Tracey [Rice] before this on helping [Community Relations Specialist] Tou Lee. I am a little confused." (*Id.*). Gunning replied by again asking Plaintiff to help since Tracey was now the Education Secretary. (*Id.*). Robling replied "I thought [Rice] was

6

marketing, too." (*Id.*). In her deposition, Robling testified she never arranged anything for the VIP Initiative. (Robling Dep. 138:21-23).That same day, Gunning prepared another Counseling Form which was placed in Robling's personnel file. (Gunning Decl. ¶7). Gunning wrote that Robling was unsupportive of her directives regarding sick-to-vacation time and was uncooperative in fulfilling Gunning's request to assist in VIP campus visits. (Dkt. 14-5 at 35-36).

On July 25, 2012, Robling sent her timeline to Simich. (Dkt. 14-5 at 37). Robling wrote that Lynn had not properly handled her initial complaint and that she is still afraid of retribution. (*Id.*). The timeline added on to her first timeline to include the dates from May 1, 2012 - July 20, 2012. (Dkt. 14-5 at 20-22; Robling Dep. 145:18-22).

HR received Robling's timeline, and in August 2012, Human Resources Director Christopher Bennett called Plaintiff to discuss her concerns. (Robling Dep. 147:11-14). During this conversation, Robling recounted: the "young and sexy comment;" overheard Gunning say she was not sure Robling could do her job; Gunning wanted younger people at the front desk; they all thought it was a hostile work environment; and she thought Gunning was retaliating against her with the timecards. (*Id.* 148:1-149:1). Gunning testified she was aware that Robling and Rice complained about her, but she was not aware of any age discrimination allegations. (Gunning Dep. 91:10-25).

On September 24, 2012, Robling submitted a timecard for Rice requesting vacation pay to ITT's Payroll Department prior to Gunning signing the timecard in approval. (Dkt. 14-5 at 38-41). Robling admitted a Pay Correction Form had to be submitted to fix her error. (Robling Dep. 167:2-4). On September 25, 2012, Natalie Hay at HQ suggested that Gunning speak with HR Partner James Anders about issuing a written warning to both Robling and Rice. (Gunning Decl. ¶8, Ex. D).

On the October 2012 work schedule, Robling changed her work start time without approval

7

to begin at 7:15 am and shortened her lunch break in order to leave early on Fridays. (Dkt. 14-5 at 48-49). On October 2, 2012, Lynn e-mailed Gunning with his displeasure with Tampa's work schedule, writing "I fail to understand why we cannot seem to follow basic direction given. ... You have an Admin coming in at 7:15.... There is nothing that occurs earlier than 7:30 that cannot be completed during regular hours" and Lynn directed Gunning to adjust the schedule. (Dkt. 14-5 at 42-43). Gunning forwarded the e-mail to Robling, asking her to ensure her hours begin at 7:30 a.m. (Dkt. 14-5 at 42-45). Robling replied "In that fifteen minutes I can do things like the mail."(DKt. 14-5 at 45). Gunning responded that she would not approve work schedules that begin before 7:30 a.m. (*Id.*)

On October 25, 2012, Robling took an unscheduled and unapproved vacation day when she forgot what days she scheduled her vacation. (Dkt. 14-5 at 47-49). At the recommendation and encouragement of Lynn, and pursuant to ITT's Corrective Action policy, on October 30, 2012, Gunning completed Section I of a Corrective Action Form based on the above conduct. (Dkt. 14-5 at 47-48; Gunning Dep. 149:10-12). Gunning did not fill in Section II or the type of corrective action, as that is determined by HR. (Dkt. 14-5 at 47-48; Anders Dep. 15:25-16:9). Gunning was concerned that Robling was doing what she wanted to do based on how she did it in the past, and not adapting to Gunning's requests. (Gunning Dep. 68:3-6).

After reviewing the documents HR Partner James Anders determined a Final Written Warning was appropriate. (Dkt. 14-5 at 47-48; Anders Dep. 18:5-20, 68:15-19). Anders explained that Robling's conduct indicated "clear signs that she did not accept [Gunning's] authority" and intentionally disregarded Gunning's directives, which are not matters of performance. (Anders Dep. 59:20-60:22, 64:12-17). Anders also explained that with conduct issues, "the expectation is they can

8

never, ever do that kind of conduct again." (*Id.* 28:7-9).

When presented with the Final Written Warning, Robling refused to sign it and told Gunning it was bogus, retaliation, and that Gunning was a micromanager. (Robling Dep. 174:13-22; Dkt. 14-5 at 48). Robling refused to speak with Gunning and when she left the office, announced loudly "I got a Final Written Warning." (*Id.* 178:3-12; 189:15-24).

On October 31, 2012, Robling complained via e-mail to several senior management personnel at HQ about the warning, claiming it was retaliation for her earlier complaints of June 28 and July 25, 2012. (Dkt. 14-5 at 49-50). In the e-mail, Robling admitted to submitting Rice's timecard with vacation pay without Gunning's final approval; admitted she unilaterally changed her working hours (claiming that in April Gunning told her she did not care how she made up the Friday time); and admitted she forgot which days she put in for vacation. (*Id.*) Robling also stated: "The Tampa campus director should empower its employees, let them do their jobs as have done before, not cut them down with constant emails that they are doing something wrong." (*Id.*) To investigate Robling's concerns, Anders spoke with Lynn, and Lynn testified that Robling's conduct was significant enough to recommend that Gunning put Robling on corrective action.[3] (Lynn Dep. 87:13-88:15). Anders testified he conducted a full and fair investigation of Robling's complaints and concluded that Robling was very upset that Gunning was a micromanager and very deep into the weeds of Tampa's operations. (Anders Dep. 15:4-7, 51:22-25).

On November 1, 2012, Bennett and Anders spoke with Robling about her e-mail complaint. (Robling Dep. 188:5-17). Robling testified that she told them Gunning was retaliating against her,

---

[3] Lynn testified that he did not believe Robling violated ITT policy intentionally, but that she nevertheless continued to do so, despite being given express feedback. (Lynn Dep. 92:14-94:20).

targeting her, and creating a hostile work environment. (*Id.* 188:16-21). Robling requested via e-mail "a synopsis of our conversation" and Bennett replied that he and Anders spent considerable time reviewing her complaint and listening to her objections; explained to her why she received a Final Written Warning; and they offered Robling suggestions to improve her working relationship with Gunning by demonstrating that she is working with her rather that working counter to her direction. (Dkt. 14-5 at 54-55). Robling admitted Bennett's e-mail was what he said during the call. (Robling Dep. 188:22-189:1).

In early November 2012, Robling submitted to the Payroll Department incorrect vacation time and sick time for Instructor Lori Barnes without obtaining Gunning's final approval.(See Dkt. 14-5 at 52-53; Gunning Dep. 177:25-178:25, 179:11-25). In her deposition, Robling admitted she changed the hours from vacation to sick time on Barnes' timecard without Gunning's final approval prior to submitting to the Payroll Department. (Robling Dep. 184:8-185:9; 77:7-16). As a result, Gunning processed another Corrective Action Form, with supporting documentation, and sent it to HR. (Gunning Decl. ¶12, Ex. F).

After the final Corrective Action Form, which Anders interpreted as a request from Gunning to terminate Robling (see Dkt. 14-2 at 7-8; Anders Dep. 77:24-78:24), but before terminating Robling, Bennett and Anders discussed Anders going back and making certain that had everything right. (Bennett Dep. 65:1-17). Bennett sent an e-mail to Anders stating that he wanted "to be certain that Sheryl [Gunning] is correct with the direction she has given Carol [Robling]." (Dkt. 14-2 at 5-6). After verifying that Robling was trained on the payroll processing procedures, Bennett approved Robling's termination. (*Id.* at 7). Lynn also suggested to Anders that Robling's employment be terminated. (Lynn Dep. 85:23-86:6).

10

On December 11, 2012, ITT terminated the employment of Robling for violating Workplace Standards for failing to follow the directives of the supervisor. (Dkt. 1 ¶ 16; Dkt. 4 ¶ 16). About two months after Robling's termination, Gunning hired Nadia Diaz (in her twenties) as her Administrative Assistant. (Gunning Dep. 102: 13-25). In September 2014, Ms. Charron Wickham (now age 61) was transferred from the St. Pete campus based on her seniority to become Gunning's Administrative Assistant. (Gunning Dep. 103:12-25; Wickham Dep. 6:19-7:7).

Robling filed a charge of discrimination with the EEOC and brought this lawsuit, contending age discrimination in violation of the Age Discrimination in Employment Act ("ADEA") and the Florida Civil Rights Act ("FCRA") and retaliation in violation of the ADEA, FCRA, and Title VII. (Dkt. 1).

## II.   STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine factual dispute exists only if a reasonable fact-finder 'could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict.'" *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is material if it may affect the outcome of the suit under the governing law. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of

11

a genuine issue of material fact, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Plaintiff's evidence must be significantly probative to support the claims. *Anderson*, 477 U.S. at 249.

The Court will not weigh the evidence or make findings of fact. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party. *Id.*

## III.    DISCUSSION

Robling brings claims of age discrimination and retaliation under the ADEA and FCRA and a retaliation claim under Title VII. ADEA and FCRA claims are analyzed under the same standards. *See Drago v. Jenne*, 453 F.3d 1301, 1307 (11th Cir. 2006).  ITT contends Robling does not have direct evidence of age discrimination, cannot establish a prima facie case through circumstantial evidence, and cannot prove pretext.  As to Robling's retaliation claims, ITT contends that Robling cannot establish a causal connection between the protected activity and the adverse action, and as required for Title VII retaliation claims, has no evidence that ITT would not have terminated her but for her complaints.

### A.    Robling's Age Discrimination Claims

The ADEA makes it "unlawful for an employer to" "discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). To establish a claim of unlawful age discrimination under the ADEA, a "plaintiff must prove by a preponderance of the evidence . . . that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs.*, 557 U.S. 167,

177–78, 129 S.Ct. 2343, 2351, 174 L.Ed.2d 119 (2009). A plaintiff may prove her prima facie case "through direct or circumstantial evidence." *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012).

### i.    Robling Has Not Submitted Direct Evidence of Age Discrimination

Robling contends that Gunning's comments about Rice being "young and sexy," Robling not being able to perform her job due to her age, and that Gunning wanted a younger assistant are direct evidence of age discrimination. They are not.

A plaintiff may establish a prima facie case of discrimination through direct evidence. *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir.1999); *Williamson v. Adventist Health Sys./Sunbelt, Inc.*, 372 Fed. App'x 936, 940 (11th Cir. 2010). The Eleventh Circuit has defined direct evidence "as evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Damon*, 196 F.3d at 1359. "Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, constitute direct evidence of discrimination." *Van Voorhis v. Hillsborough County Bd. of County Comm'rs*, 512 F.3d 1296, 1300 (11th Cir. 2008) (quoting *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir.1989) (alterations omitted)). Statements such as "[I don't] want to hire any old pilots," "Fire Early-he is too old," or "when the position open[s] up, the company [will] be looking for a person younger than Lindsey to fill it" constitute direct evidence of age discrimination. *Id.*; *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990); *Lindsey v. American Cast Iron Pipe Co.*, 772 F.2d 799, 801–02 (11th Cir. 1985). To qualify as direct evidence of discrimination, the biased statement by a decision-maker must be made concurrently with the adverse employment event, such that no inference is necessary to conclude that the bias necessarily

motivated the decision. *Damon*, 196 F.3d at 1359 (the statement "what the company needed was aggressive young men ... to be promoted," did not constitute direct evidence of discrimination," because "the comment still requires us to infer that [the defendant's] interest in promoting young men motivated his decision to terminate [the plaintiff].").

Even if Gunning made the comment that she preferred Rice because she was "sexy, young, and cute," it was made almost 5 1/2 months prior to Robling's termination. And, even after supposedly making this comment, Gunning kept Robling as her administrative assistant. This statement therefore requires an inference to conclude that ITT intended to terminate Robling because of Gunning's preference for younger employees. Similarly, any comments Gunning may have made about wanting a younger assistant are too attenuated from Robling's termination to constitute direct evidence. Finally, the alleged vague comments Rice testified Gunning made about Robling having problems performing her job because of her age are also not enough.[4] "'Congress made plain that the age statute was not meant to prohibit employment decisions based on factors that sometimes accompany advancing age, such as declining health or diminished vigor and competence.'" *Templeton v. Bessemer Water Serv.*, 154 Fed. App'x 759, 762 (11th Cir. 2005) (quoting *Young v. Gen. Foods Corp.*, 840 F.2d 825, 829 (11th Cir.1988)). Robling must therefore establish a prima facie case through circumstantial evidence.

### ii.   Robling Can Make Out A Prima Facie Case Using Circumstantial Evidence

---

[4] Robling also mischaracterizes portions of Rice's testimony regarding Gunning's comments. Rice did not testify that Gunning herself stated she wanted a younger assistant, referring to the age of Robling (Dkt. 17 at 4). Rather, Rice testified that Rice believed Gunning wanted a younger assistant. (Rice Dep. 47:4-9). Robling also claims that Rice testified that Gunning made age related comments about Robling during manager meetings (Dkt. 17 at 4). However, her testimony indicates that any such comments were related to Robling's performance, disabilities, or health problems due to her age. As discussed, Congress did not intend to prohibit employment decisions based on factors that may accompany advanced age. *See Templeton*, 154 Fed. App'x at 762.

14

ADEA Claims based on circumstantial evidence are evaluated under the McDonnell Dougles burden-shifting analysis. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination. *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012). To establish a prima facie case, the plaintiff must show that: (1) she was a member of the protected group of persons between the ages of forty and seventy; (2) she was subject to an adverse employment action; (3) a substantially younger person filled the position from which she was discharged; and (4) she was qualified to do the job from which she was discharged. *Damon*, 196 F.3d at 1359.

ITT argues that Robling cannot demonstrate the fourth element. ITT contends there is no dispute that Robling did not meet ITT's legitimate expectations at the time of her termination because she repeatedly failed to follow the directives of Gunning. This is the same conduct ITT relies on to assert it had a legitimate, nondiscriminatory reason for terminating Robling. Robling contends there is sufficient evidence demonstrating that Robling was qualified to do her job as she had been doing for over 21 years and that her previous performance evaluations show that she was performing above standards.

An individual is "qualified" for a position, for purposes of employment discrimination law, if she meets the criteria that the employer has specified for the position focusing on the plaintiff's skills and background. *Wright v. Southland Corp.*, 187 F.3d 1287, 1306 (11th Cir. 1999); *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1227 (11th Cir.1993). The fourth element may be established by evidence that the plaintiff has performed her responsibilities for several years without complaint. *Baker v. Sears, Roebuck & Co.*, 903 F.2d 1515, 1520 (11th Cir. 1990).

Defendant relies on *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997), for the

proposition that Robling must be performing well at the time of her termination. However, the court made that determination in assessing pretext, not the plaintiff's prima facie case. And, the Eleventh Circuit has held that "allegations of poor performance against plaintiffs discharged from long-held positions may be properly considered, only after a prima facie case has been established, when a court evaluates the pretextual nature of an employer's proffered nondiscriminatory reasons for termination." *Damon*,196 F.3d at 1360 (district court incorrectly considered the defendant's allegations of the plaintiff's poor performance).[5]

Robling worked for ITT for 21 years and received high performance ratings. Lynn considered her an invaluable asset and recommended her to train other administrative assistants. A jury could therefore reasonably conclude Robling was qualified for the position.

Next, ITT contends that Robling cannot argue that ITT's discipline was an adverse employment action. Specifically, that Gunning's emails to Robling and the Final Written Warning do not constitute adverse action because they did not affect her compensation, terms, conditions, or privileges of employment, deprive her of opportunities, or adversely affect her status. However, there is no dispute that Robling suffered an adverse employment action when she was terminated.[6] Therefore, viewing the facts in the light most favorable to Robling, the jury could determine that she makes a prima facie case of age discrimination.

### iii.    Robling's Termination Was Legitimate and Not Pretextual

---

[5] *See also Robinson v. Armstrong World Indus., Inc.*, No. 5:12-CV-390 MTT, 2014 WL 3420449, at *7 (M.D. Ga. July 10, 2014) ("Generally it is not appropriate to rely on the same allegation of poor performance asserted as a legitimate nondiscriminatory reason for termination to show a plaintiff was not qualified for the position.").

[6] The only adverse employment action Robling advances in support of a prima facie case is her termination. Although ITT argues that these other incidents do not constitute adverse employment actions Robling did not respond to ITT's arguments, and therefore, abandoned any age discriminate claim based on those incidents. *See Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009); *Johnson v. Bd. of Regents*, 263 F.3d 1234, 1264 (11th Cir. 2001).

Robling fails to overcome ITT's legitimate, non-discriminatory justification for her termination. ITT bears the burden of establishing that Robling was terminated for legitimate reasons, and if it does so, the burden shifts to Robling to show that ITT's reasons were pretextual. *See Chapman*, 229 F.3d at 1024; *Damon*, 196 F.3d at 1361 ("We have repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law. . . . We are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful [retaliation] motivates a challenged employment decision.")

ITT's contends it terminated Robling for violating Workplace Standards by failing to follow the directives of her supervisor, Gunning. It is undisputed that pursuant to ITT's policies, an employee can be terminated "at any time in the sole discretion of ITT/ESI, including, without limitation, if ITT/ESI determines that the requirements of a final written warning are not met or a counseling, a written warning or a final warning is not sufficient. All terminations of employment must be approved in advance [by] the Director of Human Resources" (Dkt. 14-5 at 11-13).

Robling has not carried her burden of establishing that ITT's stated reason for termination was pretextual. She is required to "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1275 (11th Cir. 2008) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)). She must do so in the "form of specific facts" that show the employer's reasons were pretextual. *Wilcox v. Corr. Corp. of Am.*, 2015 U.S. App. LEXIS 3768, at * 11 (11th Cir. Mar. 11, 2015) (quoting *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009)). Rather than simply

17

disputing the facts underlying her termination, Robling must show that ITT did not truly rely on the proffered reasons. *See Damon*, 196 F.3d at 1363 n.3 (11th Cir. 1999) ("An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct.") Therefore, the inquiry on pretext centers on the employer's "good faith belief," not the employee's interpretation of the events. *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000).

Applying this standard, Robling is unable to demonstrate that ITT did not honestly believe she had violated Workplace Standards by failing to comply with Gunning's directives. Robling's contentions about *her* beliefs–that she did follow Gunning's directives – cast no doubt on *ITT's* motivations. And Robling's interpretation of how ITT's discipline process should have been implemented is of no moment. (*See* Dkt. 17 at 18-19). Accordingly, Robling has failed to carry her burden of demonstrating that ITT's reasons for her termination were pretextual.[7]

### B.  Retaliation

To establish a prima facie case of retaliation, a plaintiff must show (1) he engaged in statutorily protected activity, (2) suffered a materially adverse employment action, and (3) there was a causal relationship between the two events. *See Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1211 (11th Cir. 2013); *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008). If Robling can establish a prima facie case of retaliation, ITT then bears the burden to establish a legitimate, non-retaliatory reason for the adverse action. *Coutu v. Martin County Bd. of County Com'rs*, 47 F.3d 1068, 1075 n. 54 (11th Cir. 1995). And if ITT is able to do so, Robling then must

---

[7] *Cf. Williamson*, 372 Fed. App'x at 940 ("Williamson's refusal to perform the duties to which he was assigned provided a legitimate, non-discriminatory reason for Oceanside to not request him again, and Williamson provided nothing to show that this proffered reason was unworthy of credence, or otherwise pretextual.").

establish the reasons given by ITT were a pretext for retaliation. *Chapman*, 229 F.3d at 1024. As explained below, summary judgment is due to be granted to ITT, because even though Robling is able to demonstrate a prima facie case of retaliation, ITT established a legitimate, non-retaliatory reason to terminate her, and Robling cannot establish ITT's reasons were actually pretextual.

### i.    Robling Can Make a Prima Facie Case of Retaliation Under the ADEA

ITT contends that Robling cannot establish a causal connection between her complaints and her termination.  ITT does not dispute that Robling engaged in statutorily protected activity and suffered a materially adverse employment action.  Robling's June 2012 email complaint was protected conduct and her December 2012 termination was an adverse decision.  Robling also contends that the October 2012 Final Written Warning was an adverse action and that her July 2012 complaint to Simich and October 31, 2012 complaint to HR in connection with her Final Written Warning was protected conduct.[8] Viewing the facts in the light most favorable to Robling, the June, July, and October internal complaints constituted statutorily protected activity. Therefore, Robling must demonstrate a causal relationship between that protected activity and her termination in December 2012.

The requirement of a causal link is "broadly" construed. *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004). Indeed, a plaintiff need only show that the protected conduct and adverse employment action "are not completely unrelated." *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998) (quoting *E.E.O.C. v. Reichhold Chem., Inc.*, 988 F.2d 1564, 1571–72 (11th Cir. 1993)). To demonstrate a causal relationship, a plaintiff must demonstrate the adverse decision was

---

[8] Robling also contends she spoke directly to Bennett and Anders regarding her complaints on November 1, 2012.

made by a person with knowledge of the protected expression, and that there is evidence tending to show causation or a close temporal proximity between the protected express and the adverse action. *Higdon*, 393 F.3d at 1220. A close temporal proximity has been interpreted to include as long as one month, but periods of three or four months have been deemed too protracted. *Brown v. Alabama Dep't of Transportation*, 597 F.3d 1160, 1182 (11th Cir. 2010). An ultimate adverse action can be linked to temporally distant protected expression if there is a chain of intervening retaliatory acts between the two. *See Bass v. Bd. of Cnty. Comm'rs, Orange Cnty., Fla.*, 256 F.3d 1095, 1117-19 (11th Cir. 2001) (overruled on other grounds by *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

Robling has not demonstrated through direct evidence a causal link between the protected conduct in June, July and October, and her December termination. Instead, she attempts to temporally link her protected conduct by showing close temporal proximity between the protected expression and the adverse action. Namely, the October complaint and the December termination.[9]

A jury could find that Robling engaged in protected activity as late as November 1, 2012, and thereafter was terminated on December 11, 2012, less than two months later. Therefore, viewing the facts in the light most favorable to Robling, the jury could determine that she makes out a prima facie case of retaliation. *See Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) (seven-week interval between protected activity and adverse action sufficiently proximate to create a causal nexus for purposes of establishing a prima facie case).

However, as discussed, Robling cannot demonstrate pretext to overcome ITT's legitimate,

---

[9] Robling also relies on the date of November 30, 2012, when she claims Gunning recommended her termination.

20

non-retaliatory reason for her termination. Therefore, ITT is entitled to judgment as a matter of law on her ADEA and FCRA retaliation claims.

### ii.    Robling Cannot Make a Prima Facie Case of Retaliation Under Title VII

To establish a claim of retaliation under Title VII, Robling must prove but-for causation—that the unlawful retaliation would not have occurred in the absence of the protected activity. *Texas Southwestern Medical Center v. Nassar*, 570 U.S. ——, 133 S.Ct. 2517, 2533-34 186 L.Ed.2d 503 (2013); *Smith v. City of New Smyrna Beach*, 588 Fed. App'x 965, 981 (11th Cir. 2014). Robling has not addressed this standard nor has she identified any evidence that ITT would not have terminated her but for her complaints. Therefore, she fails to create a triable issue with respect to her Title VII claim and ITT is entitled to judgment as a matter of law.

Accordingly, Defendant's Motion for Summary Judgment (Dkt. 14) is **GRANTED**. The Clerk is directed to enter final judgment in Defendant's favor and **CLOSE** the file.

**DONE AND ORDERED** this __16th__ day of April, 2015.

JAMES D. WHITTEMORE
United States District Judge

Copies to: Counsel of Record